NO. 07-08-0433-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL B



NOVEMBER 25, 2008



______________________________





CARL VAN JOHNSON, APPELLANT



v.



THE STATE OF TEXAS, APPELLEE



_________________________________



FROM THE 320TH DISTRICT COURT OF POTTER COUNTY;



NO. 54,470-D; HON. DON EMERSON, PRESIDING



_______________________________



Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Â 
MEMORANDUM OPINION
Â Â Â Â Â Â Â Â Â Â Pursuant to a plea bargain, appellant, Carl Van Johnson, was convicted of burglary
of a habitation and sentenced to 20 years incarceration in the Institutional Division of the
Texas Department of Criminal Justice. Appellant filed a notice of appeal in which he
requested appointment of appellate counsel. We dismiss for want of jurisdiction.
Â Â Â Â Â Â Â Â Â Â Appellantâs sentence was imposed on January 7, 2008. His notice of appeal


 bears
a file stamp date from the District Clerk of July 21, 2008. Unless certain post-judgment
motions are filed, a defendant must file a written notice of appeal with the trial court clerk
within 30 days after the date sentence is imposed. Tex. R. App. P. 26.2(a). The Texas
Rules of Appellate Procedure provide for a 15-day extension in which to file a notice of
appeal if it is accompanied by a motion for extension of time. Tex. R. App. P. 26.3. This
Court is without jurisdiction to address the merits of an appeal and can take no action other
than to dismiss the appeal if it is not timely perfected. See Slaton v. State, 981 S.W.2d
208, 210 (Tex.Crim.App. 1998). Appellantâs notice, which was filed more than seven
months after sentence was imposed, is untimely and does not invoke our jurisdiction.
Â Â Â Â Â Â Â Â Â Â Accordingly, the purported appeal is dismissed for want of jurisdiction.



Â 
Mackey K. Hancock

Justice




 channels available were not
pornographic.

 With regard to whether All Star was a sexually oriented business, Lovett was cross-examined repeatedly about what he believed would constitute a "primary" business. Lovett
averred that in making his determination of whether a store is a sexually oriented business,
he looks "at the total picture of the store, what is offered to customers. I look at the arcade
section, see what type of movies are available for viewing. I look at the primary business. 
I don't - I cannot give you just a simple answer of one item versus another." When queried
whether he had any guidelines as far as a certain percentage of adult content that would
make a store's business sexually oriented, he admitted he did not have any such
guidelines. Lovett also testified that All Star ran an ad in an adult bookstore trade
publication which featured the fact that it had an "[a]ll new super huge movie arcade with
over 30 different titles."

 Officer Shipley, the State's second witness, testified that he had been to that All
Star location approximately 50 times over the past three or four years. When he entered
All Star's premises on September 6, 1999, he did not see any patrons in the video rental
section. He, too, paid the $6.00 admission fee to appellant, who "buzzed" him into the
arcade section. Shipley pointed out that the door to the arcade section was electronically
controlled, and he believed appellant was the manager that night because he was the only
employee there and was in charge of the premises. He also described the arcade portion
of All Star and noted that appellant could not see into that portion of the store.

 As he walked into the arcade, Shipley noticed four or five men "just leaning up and
walking around." As he walked through the arcade, Shipley noticed about 20 to 25
patrons. More specifically, he described those patrons as participating in a "stalking-type
ritual" which meant "[t]hey're looking for anonymous partners for sex." He added that some
patrons "would motion us into the rooms or they would stand in the rooms masturbating
and then motion us, you know, or make reference to have us come in and join them, that
type of activity." He also observed two wall penetrations in the cubicles.

 Shipley videotaped the premises that day, which was received into evidence. He
said appellant did not present a permit authorizing him to act as the manager of a sexually
oriented business and that he never saw such a permit. Another officer, Officer Williams,
also paid the $6.00 fee and was admitted to the arcade portion by appellant. He also said
that appellant's view into the arcade was "obstructed by plywood and Sheetrock wall," and
"upon going into the video booths, it was noted there was a 'glory hole' or a wall
penetration between the two booths." He said that three of the arcade patrons were
arrested for indecent exposure and, when asked if he knew what was going on back there,
appellant replied that he "didn't want to know . . . and he tried not to go back there."

 Officer Robert Foulis testified that a business known as Houston All Star News,
located at the same address as All Star, had unsuccessfully applied for a sexually oriented
business permit in April of 1997 on two occasions. The first application was denied
because of a failure to meet certain "signage" [sign] requirements and free standing
building color requirements. The second application was denied because of certain
residential density requirements. Foulis said that All Star previously had a permit, but
when the ordinance was changed, it lost it. He also said that appellant had no manager's
permit and had never applied for such a permit. He also pointed out that in order to obtain
a manager's permit, "[a]ll you need is two passport-type photos, valid governmental issued
Id with a picture and a $29 money order and not to have been convicted of any of, like, 1
of 13 crimes within the last 5 years."

 During his presentation of the case, appellant testified and said he was "definitely
not the manager." In describing a typical day at work, he averred the "[f]irst thing I do
would be to check in with the previous clerk as far as making sure that the bank is in order. 
We have a set amount in the bank. I check the bank, and as long as that is in order, the
previous clerk signs off on it. I sign it also, it's deposited and then I take over the shift." 
According to him, All Star has a hired crew to do the janitorial work and he spent most of
his time behind the counter. He said that because of the electronic door it would be
"virtually impossible" for him to go into the arcade area and he had no reason to go in. He
averred that he never ordered inventory or stocked the shelves of All Star. He said that
he was paid $6.00 per hour without benefits.

 Michael Allen Foster, an employee of All Star's owner, Campus Investments,
testified that approximately 40 percent of the videos All Star stocks are adult and that less
than 40 percent of the written material they stock are adult material. He did not include
magazines such as Playboy, Penthouse, and Gallery as adult material because they "are
sold everywhere." Foster observed that All Star was in the business of buying, selling, and
trading magazines and videos. He stated that there are 42 arcades or "mini-theaters" at
All Star and that there are 17 channels in the first two hallways and in the back two
hallways there are 36 channels. Each "mini-theater" has its own video player and the
movies are changed out so that more than 60 percent are non-adult. Foster opined that
out of the 36 channels, usually 20 were non-adult and 16 were adult "depending on if
there's a VCR broke or not broke." He also said that he is the only one with a key to
change out videos. He also admitted that if there were 25 customers in different arcades
at the same time, all 25 could watch the same movie. He believed that between 65 and
70 percent of the lobby floor area was allocated to non-adult materials. When questioned
as to what other merchandise All Star carries, Foster testified "sexual aids, lubricants,
contraceptives, some vibrators, toys, gag gifts, fuzzy handcuffs. We sell just about
everything you could imagine. Aspirins, just a lot of stupid things." Foster conceded that
when an item is rung up on the cash register, there is no way to tell whether it was adult
or non-adult because only the price is entered.

 Appellant also called Police Lieutenant Douglas Larry Smith, who had been with the
vice department for about 15 years. Defense counsel's questioning of him focused on
testimony Smith had given at a trial in 1995 and his reference there to the term "50/50
store" which meant 50 percent adult merchandise and 50 percent non-adult. If the adult
material was less than 50%, the store did not need a permit. He described some of the
standards he used in determining whether a business is sexually oriented. Specifically,
whether more than 50 percent of their stock is X-rated, as well as what items generated
the store's business and the square footage of the business. Smith also stated that, to his
knowledge, there were no written criteria within his command explicating standards by
which a police officer could follow in arriving at the 50/50 store determination. 

 During cross-examination by the State, Smith explained that the ordinances
themselves served as written guidelines. In determining whether a business is sexually
oriented, "[w]e look for several things. We look at the - the particular things that they have
for sale or for rent, merchandise. The clientele, we look for clientele that's going into the
business. We look for - we also look in the area of have they - did they have a sexually
oriented business permit in the past. Things such as that." Smith said the police are
"looking for a good faith effort [of] what the business is actually . . . doing." He admitted
that the officers would make an "eyeball estimate" about what is being sold. Calculating
a store's revenue from sexually oriented material as opposed to other merchandise would
be very hard to do, but that it might be done in the case of a store that is a "close call." 
Smith had visited All Star "a couple of times" and, in his opinion, it was clearly a sexually
oriented business and "wouldn't be a close call."

 Chapter 243 of the Local Government Code empowers cities to regulate sexually
oriented businesses. In relevant part, it defines a sexually oriented business as:

 . . .a sex parlor, nude studio, modeling studio, love parlor, adult bookstore,
adult movie theater, adult video arcade, adult movie arcade, adult video
store, adult motel, or other commercial enterprise the primary business of
which is the offering of a service or the selling, renting, or exhibiting of
devices or any other items intended to provide sexual stimulation or sexual
gratification to the customer.


Tex. Local Gov't Code Ann. § 243.002 (Vernon 1999).


 In carrying out this authority, the city enacted its ordinance number 97-75. The
ordinance defines "manager," "sexually oriented enterprise," and "adult bookstore" as
follows:

 Manager. Any person who supervises, directs or manages any
employee of an enterprise or any other person who conducts any business
in an enterprise with respect to any activity conducted on the premises of the
enterprise, including any "on-site manager."


Houston City Ordinance No. 95-75 Â§ 28-251. 


 Enterprise. An adult bookstore, adult cabaret, adult encounter parlor,
adult lounge, adult modeling studio, adult movie theatre or any
establishment whose primary business is the offering of a service or the
selling, renting or exhibiting of devices or any other items intended to
provide sexual stimulation or sexual gratification to its customers, and which
is distinguished by or characterized by an emphasis on matter depicting,
describing or relating to specified sexual activities or specified anatomical
areas.


 Adult Bookstore. An establishment whose primary business is the
offering to customers of books, magazines, films, or videotapes (whether for
viewing off-premises or on-premises by use of motion picture machines or
other image-producing devices), periodicals, or other printed or pictorial
materials which are intended to provide sexual stimulation or sexual
gratification to such customers, and which are distinguished by or
characterized by an emphasis on matter depicting, describing or relating to
specified sexual activities, or specified anatomical areas.


Houston City Ordinance No. 97-75 Â§ 28-121.


 Adult arcade . . . any premises that is subject to regulation under Chapter
243 of the Local Government Code, as amended, to which members of the
public or members of any club, group or association are admitted and
permitted to use one or more arcade devices.


 Arcade device . . . any coin- or slug-operated or electronically or
mechanically controlled machine or device that dispenses or effectuates the
dispensing of entertainment, that is intended for the viewing of five (5) or
fewer persons in exchange for any payment of any consideration.


 Entertainment shall mean:


 1) Any live exhibition, display or performance; or


 2) Any still picture(s) or movie picture(s), whether mechanically, electrically
or electronically displayed; or


 3) Any combination of the foregoing, in which the specified anatomical areas
or specified sexual activities are depicted.


Houston City Ordinance No. 97-75 Â§ 28-81.


 In his first issue, appellant challenges the sufficiency of the evidence to sustain a
holding that All Star was an adult bookstore, and that appellant served as a manager. In
his second issue, appellant argues the evidence is insufficient to prove All Star was an
adult arcade or that appellant acted as an operator of an adult arcade. Because these
issues are so closely related, we will consider them together. The standards governing
our review of legal and factual sufficiency challenges are now so well established as to be
axiomatic and it is not necessary to reiterate them here. See Jackson v. Virginia, 443 U.S.
307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and Clewis v. State, 922 S.W.2d 126
(Tex.Crim.App. 1996). Suffice it to say that we must first determine whether the evidence
is legally sufficient and, if it is not, render a judgment of acquittal. Id. at 133. If the
evidence is legally sufficient, we must then determine if it is factually sufficient when
measured by the standard explicated in Clewis. Id. 

 The evidence which we have set out in some detail is ample to sustain the trial
judge's finding that All Star is both an adult bookstore and an adult arcade. The question
then presented is whether the evidence is sufficient to sustain a finding that appellant was
acting as a manager/operator of All Star within the purview of the ordinance. The evidence
is undisputed that at the time in question here, appellant was the only employee present
and was operating the cash register and the electronic control admitting patrons to the
arcade.

 The very recent decision of the 14th Court of Appeals in Pedraza v. State, 34 S.W.2d
697 (Tex.App.-Houston [14th Dist.] 2000, no pet.) is instructive in interpreting the
ordinance. In that case, the court was also presented with the question of whether the
evidence was sufficient to sustain a finding that the appellant was an "operator" of an adult
arcade. The court of appeals noted the trial evidence concerning Pedraza was 1) he was
the only person working behind the counter, and 2) he was "in charge" of the arcade while
[the police officer] was there. Id. at 700.

 En route to reversing the conviction, the appellate court viewed the ordinance as
a whole and, in particular, the detailed requirements the "operator" must comply with in
order to obtain a permit. Id. at 699. After doing so, it commented that it was clear that in
the ordinance, the city intended an operator to mean more than a clerk or an employee
who simply minds the store, and concluded that the trial evidence was legally insufficient
to show that Pedraza possessed "managerial control" such that he was an operator as that
term is defined in the ordinance and was really nothing "more than a mere clerk." Id. at
700. 

 Here, the evidence was very similar to that before the Pedraza court. As was the
case in Pedraza, we can conclude that appellant was only a clerk who minded the store
and whose responsibilities were not sufficient make him a "manager" as the term is defined
in the ordinance. (1) Appellant's first two issues must be, and are, sustained. That action
nullifies the necessity for a discussion of appellant's remaining two issues.

 Accordingly, the judgments of the trial court are reversed, and judgment rendered
acquitting appellant of the offenses of which he was convicted. Tex. R. App. P. 43.2(c).


 John T. Boyd

 Chief Justice


Do not publish.
1. As did the Pedraza court, we note that the ordinance does place a duty on
employees and agents of the arcade to keep the view unobstructed. However, the State
did not charge appellant as an employee or agent and that question is not before us.